USDC SDNY
DOCUMENT
ELECTRONICALLY FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

JULIO MORONTA,

Petitioner,

-v-

PATRICK GRIFFEN,

Respondent.

---------------------------------------------------------X

13 Civ. 4081 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On June 11, 2013, petitioner Julio Moronta ("petitioner" or "Moronta") filed this pro se petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 ("the petition"). (ECF No. 2.) The petition seeks relief from Moronta's March 24, 2010 conviction, following a jury trial, of one count of murder in the second degree. (New York Penal Law § 125.25[1].) The trial judge sentenced Moronta to 25 years to life in prison.

On June 5, 2012, the Appellate Division, First Department, unanimously affirmed Moronta's conviction. See People v. Moronta, 945 N.Y.S.2d 303 (1st Dep't 2012. On December 26, 2012, the New York Court of Appeals denied Moronta leave to appeal without opinion. (See Ans., Ex. H, Oct. 18, 2013, ECF No. 9.) Moronta is currently incarcerated pursuant to that conviction.

Moronta challenges his conviction on the grounds that the trial court violated his constitutional due process rights by denying his request for a jury instruction on the state law affirmative defense of extreme emotional disturbance. Moranta also

claims that the sentence imposed by the trial judge is excessive and should be reduced in the interests of justice. (See Petition, June 11, 2013, ECF No. 2.)

For the reasons set forth below, Moronta's habeas petition is DENIED in full.

I. FACTUAL BACKGROUND

On August 16, 2008 in the late-evening, petitioner learned that his former common-law wife and the mother of his daughter, 35-year-old Eduvigis Eustate, was socializing outside of a salon at 148th Street and Amsterdam Avenue in Harlem.[1] (Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp't Mem.") at 12, Oct. 18, 2013, ECF No. 10; Ans., Ex. A at 8.) Petitioner went to where Eustate was located and found Eustate with her new boyfriend, Edgar Vicente, and another individual with whom petitioner believed Eustate was sleeping, Alex Cuervas.[2] (Ans., Ex. A at 8-9.) According to petitioner, he went to visit Eustate – despite the existence of a protective order that forbid such contact[3] – because their teenage daughter had stopped calling him.[4] (Tr. 471.) Petitioner testified that he "was going to get on the bus and I had to go by 148th

[1] Petitioner and Eustate's relationship lasted "10 or 11 years;" Eustate left petitioner in 2006. (Tr. 450; Ans., Ex. B. at 1.)

[2] Petitioner had been drinking for much of the day, beginning around 1:30 p.m. (Tr. 450-54; Resp't Mem. at 11.) Petitioner had consumed roughly between 14 and 17 beers, half a bottle of cognac, and 1 to 2 grams of cocaine prior to arriving at 148th Street and Amsterdam Avenue. (Tr. 452-54.) Petitioner testified that in August 2008, he drank between 16 and 20 beers on a daily basis. (Tr. 451.)

[3] Petitioner testified that he was convicted of a felony in 2007 for violating an order of protection held by Eustate. (Tr. 449-50.) Petitioner explained during the trial that he knew he was not supposed to contact Eustate. (Tr. 471-72.)

[4] Petitioner testified that his daughter was in the Dominican Republic for the summer. (Tr. 473-73.)

Street" (tr. 469), so decided to "go[] by to see if I saw her so I can ask her why my daughter hadn't called me." (Tr. 469, 471.) Petitioner testified that he believed that Eustate and Vicente were keeping petitioner's daughter from contacting him. (Tr. 531; Ex. 27.)

While Vicente and Cuervas were otherwise occupied, Eustate saw petitioner, told him he was a bad man and a bad husband (Ex. 27), and said to him: "You and I have separated for two years ago, you big stupid fag." (Ex. 27; Tr. 532.) Thereafter, petitioner stabbed Eustate in the back using a six-inch kitchen knife.[5] (Resp't Mem. at 2.) Petitioner testified: "I got pissed off and I had a knife with me and I took it out and swung at her. I kind of lost my head out of jealousy and things. I don't know what happened. It was seconds. It went really fast." (Tr. 457.) When asked whether he stabbed Eustate, petitioner testified: "At the moment I didn't really realize it." (Tr. 457.)[6] The knife's six-inch blade was forced eight inches into Eustate's body. (Resp't Mem. at 2.)

Petitioner then turned and lunged for Cuervas. (Tr. 161.) Cuervas ran away and testified that as he was coming back to the scene with a garbage can for

---

[5] Petitioner lived in the Bronx and stated that he always carried the knife with him for protection when walking through the Bronx. (Tr. 464.) On the day of the incident, petitioner departed his apartment with the knife concealed on his person. (Tr. 463-64.) He brought the knife with him to a church party, but afterward, stored it underneath garbage cans located near 150th Street and Broadway. (Tr. 462-66.) Petitioner retrieved the knife on his way to the salon where Eustate was located. (Tr. 466-69.) Petitioner explained that he intended on stopping by the salon and then proceeding home. (Tr 469-70; Resp't Mem. at 12.)

[6] Petitioner stated that it was not his intention to kill Eustate on the day of the incident. (Tr. 458.)

protection, he saw where petitioner had stabbed Eustate in the stomach. (Tr. 134, 166.) Petitioner again tried to attack Cuervas. (Tr. 134.) Vincente noticed the commotion and as he neared the scene, petitioner started chasing and swinging the knife at Vincente. (Tr. 197-99.)

Nearby police officers also noticed the commotion and upon arriving to the scene of the incident, confronted petitioner (who was still brandishing the knife). (Tr. 282.) The police officers told petitioner to freeze and drop the knife (tr. 254); petitioner complied and was subsequently arrested and transported to the local precinct by other officers who subsequently had arrived on the scene. (Tr. 267-68.)

While petitioner testified that he did not say anything to these officers while being transported (tr. 492-93), one of the officers testified in rebuttal that petitioner "loudly" and "calmly" said "she deserved it" in Spanish during the drive to the precinct. (Tr. 540-43.)[7]

The arresting officers remained with Eustate until an ambulance arrived. (Tr. 265, 321-22.) Eustate died at the hospital a few hours later; she had three stab wounds – one to the upper back and two to the abdomen – and the coroner testified the back and one of the abdomen wounds were the causes of death (and that each independently could have caused the death). (Tr. 392.) At 4:40 a.m., petitioner

[7] The officer did not write this occurrence in her memo book; indeed, the first time the officer told anyone about this statement was in November 2009 (more than one year after the crime). (Tr. 540-44.) The officer who claimed to have heard the statement speaks both English and Spanish. (Tr. 540.)

wrote and signed a statement admitting that he had attacked Eustate with a knife. (Tr. 526-28, Ex. 27.)[8]

On September 8, 2008, a grand jury indicted petitioner for one count of murder in the second degree (New York State Penal Law § 125.25[1]) and two counts of attempted assault (New York State Penal Law §§ 110/120.10[1]).

At trial, petitioner testified that he blacked out the entire incident; he stated that he cannot remember anything from the time he saw Eustate sitting with Cuevas and Vincente until the time he was being arrested. (Tr. 457-59, 480-81, 493-94.)

## II. PROCEDURAL HISTORY

At the close of testimony, defense counsel requested an extreme emotional disturbance charge. Defense counsel stated: "I believe that there is a reasonable

---

[8] The statement was written in the presence of a police detective between 3:30 a.m. and 4:35 a.m. (Tr. 528.) The statement, written in Spanish and translated by the trial court interpreter, stated in part:

> And I went by to leave on the bus and I stopped by there and she started to yell things at me, and the one that has the car, I think he's her lover now, he wouldn't let me leave – he wouldn't let me see her daughter, doesn't put her on the phone to call me and that makes me really ill. . . . I have felt very bad about all of this. I can't sleep. I spent nights awake thinking about all of this, which has me crazy. When she told me, you and I have been separated for two years, you big stupid fag, and I got pissed off and I had a knife with me and I took it out and swung at her. Because over there were a bunch of men. And I swung once and the police came – and the police was there and I swung to the stomach once, and I hit her with a knife and the police and they arrested me. (Ex. 27.)

view of the evidence, that Mr. Moronta, when he saw his ex-wife surrounded by people who he perceived to be her current lover, in his condition, which was intoxicated, had an extreme emotional disturbance [and] acted on that extreme emotional disturbance." (Tr. 547.) Counsel went on to state: "[T]he fact that [Mr. Moronta] had this long-standing relationship with her, and the fact that he was jealous and that he couldn't stand to see her with somebody else was reasonable from his [perspective] to have that extreme emotional disturbance." (Tr. 547.) The trial court denied defendant's request, finding that defendant had failed to put forward sufficient evidence to satisfy the elements of the defense. (Tr. 554-55.)[9]

On March 24, 2010,[10] Moronta was convicted, following a jury trial, of murder in the second degree; he was found not guilty on the two counts of attempted assault. (Tr. 631-32.) Defense counsel made a CPL § 330 motion to set aside the verdict, in part based on the trial court's failure to charge the jury with extreme emotional disturbance – the court denied the motion. (Sentencing Tr. 2-3.)

At sentencing, defense counsel argued that defendant's psychiatric issues warranted leniency, as did his willingness to accept responsibility for the crime. (Sentencing Tr. 9-10.) Counsel noted that defendant had sought psychiatric help in 2007 and that he had been given mood stabilizers. (Sentencing Tr. 10.) Counsel

---

[9] The court did grant defense counsel's request to charge the jury with intoxication and manslaughter in first and second degree. (Tr. 555.)
[10] Moronta states in his petition that his judgment of conviction was March 4, 2010 and that his sentencing occurred on March 24, 2010. (See Petition at 1.) However, the Appellate Division stated that the judgment was rendered on March 24, 2010. Moronta, 945 N.Y.S.2d at 418.

also stated that petitioner had stopped taking both his psychiatric and his diabetes medication weeks prior to the crime and that he had started self-medicating.[11] (Sentencing Tr. 10.) Counsel explained that "he was self-medicating; he was drinking every day, he was smoking marijuana and he was just trying his best to cope. I think he was a broken man at that point, Judge. I think he has psychiatric problems, Judge." (Sentencing Tr. 10.) Petitioner was sentenced to a term of 25 years to life, the maximum sentence available under the law. Moronta, 945 N.Y.S.2d at 418.

The Appellate Division, First Department affirmed Moronta's conviction. Id. The court found that the court "properly denied defendant's request for an extreme emotional disturbance charge" because there "was simply no credible evidence that defendant was acting out of extreme mental trauma or extremely unusual and overwhelming stress when he killed Eustate." Id. at 419-20 (internal quotation marks and citations omitted). The court further held that "defendant's 'very calm' demeanor and cold statement in the police car, 'She deserved it,' shows [defendant's] recognition that he had accomplished a predetermined objective in killing Eustate and defeats the notion that he 'didn't really realize' what was happening." Id. (internal quotation marks omitted).

On December 26, 2012, the Court of Appeals denied leave to appeal. (Id., Ex. H.) On June 11, 2013, Moronta filed the instant pro se habeas petition.

---

[11] Papers submitted to the First Department suggest that petitioner was clinically depressed at the time the incident occurred. (See Ans., Ex. A at 3.)

## III. LEGAL FRAMEWORK

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires that in order for a petitioner to prevail on a petition for habeas corpus, he must demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(l)-(2). A petitioner demonstrates that a state court's decision is contrary to clearly applicable federal law "by demonstrating either (1) that the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court, or (2) that, when presented with facts that are materially indistinguishable from a relevant Supreme Court precedent, the state court arrived at a result opposite to the one reached by the Supreme Court." Evans v. Fischer, 712 F.3d 125, 132-33 (2d Cir. 2013) (internal quotation marks and citation omitted). A petitioner demonstrates that a state court decision was based on an unreasonable application of federal law by proving that the state court "unreasonably applied" federal legal principles "to the facts of the case before it . . . involv[ing] some increment of incorrectness beyond error." Id. (internal quotation marks and citation omitted).

Obtaining habeas relief is a high burden and a reviewing court must give a state court decision due deference. See Harrington v. Richter, – U.S. – , 131 S.Ct. 770, 786-87 (2011) ("If this standard is difficult to meet, that is because it was meant to be."); Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (noting that Section

2254's "highly deferential" standard "demands that state-court decisions be given the benefit of the doubt"). Indeed, state court decisions are presumed to be correct, and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Habeas will not be granted "merely because there is a reasonable possibility that trial error contributed to the verdict . . . ." Hamilton v. Lee, No. 11 Civ. 7322, 2012 WL 5506074, at *3 (S.D.N.Y. Nov. 9, 2012).

## IV. EXTREME EMOTIONAL DISTURBANCE JURY CHARGE

Moranta's first argument in support of his claim for habeas relief is that the trial court should have charged the jury on the affirmative defense of extreme emotional disturbance; he claims the trial court's failure to do so violated his constitutional right to due process. (Petition at 2, 5.)

### A. Exhaustion

"To be eligible for habeas relief, the 'substance' of [petitioner's] Fourteenth Amendment claim must have been exhausted, that is, it must have been 'fairly presented' to the appropriate state appellate court." Jackson v. Edwards, 404 F.3d 612, 618 (2d Cir. 2005) (citations omitted). As was the case in Jackson, respondent here argues that petitioner's due process claim is barred because his arguments before the appellate court focused only on the allegation that the trial court's failure to give the requested jury instruction violated New York law; counsel "failed to cite

the federal Constitution, federal case law, or state cases employing federal constitutional analysis." Id. at 618-19. (Resp't Mem. at 18-20.)[12]

However, as was the case in Jackson, this Court finds that petitioner sufficiently exhausted his argument regarding the extreme emotional disturbance charge. The Second Circuit in Jackson explained:

> The purpose of the exhaustion requirement is to ensure that a state court is given the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.' Picard v. Connor, 404 U.S. 275 (1971) (internal quotation marks and citation omitted). This opportunity is most straightforwardly presented when the relevant constitutional principle is explicitly raised in state proceedings. However, this opportunity is also presented when the substance of the federal habeas corpus claim is clearly raised and ruled on in state court, id. at 278, although the federal principle may initially be attached to a different label than the one ultimately affixed in federal habeas proceedings.

Id. at 619 (citations omitted). The key question is the "degree of similarity between the claims that a petitioner presented to the state and federal courts." Id. (citing cases). In Jackson, the court held that although the petitioner relied on state law in arguing that the jury should have been charged with a particular instruction (in that case, the defense of justification), the appellate court's analysis would have been the same had petitioner argued that the instruction's omission violated federal

[12] Respondent notes that in his briefs to the appellate court, petitioner cited to one federal case, but did not cite it "for any point involving federal constitutional law, but only to claim that the purportedly 'reckless' manner in which [petitioner] committed the attack constituted sufficient evidence to establish the subjective prong of the defense." (Resp't Mem. at 18-19 n.12.)

due process and accordingly, the (unmentioned) federal claim had been exhausted. Id. at 620-21.

Based on Jackson, this Court finds that even though petitioner "did not explicitly invoke due process, [his argument in state court] unavoidably raised the entirety of his federal claim." Jackson, 404 F.3d at 621; see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curium) (explaining that the state and federal law inquires must be "virtually identical," rather than merely "somewhat similar" in order to exhaust the federal law claim when only the state law claim was raised). Since in this case the question of whether an extreme emotional disturbance charge was required under state law is inextricable from whether the failure to give such a charge is a violation of petitioner's due process rights, the Court finds that the claim is sufficiently exhausted.

B. Merits

In deciding whether petitioner is entitled to habeas relief based on the merits of his claim, this Court must engage in a three-part inquiry. First, was petitioner entitled to an extreme emotional disturbance charge under New York law? Second, if so, did the failure to give the charge violate petitioner's federal due process rights? Third, if so, did that denial result in a decision that was contrary to or an unreasonable application of clearly established Supreme Court law? See, e.g., Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001); see also Jackson, 404 F.3d at 621; Blazic v. Henderson, 900 F.3d 534, 541 (2d Cir. 1990) (citations omitted) ("As a

preliminary matter, due process does not require the giving of a jury instruction when such charge is not supported by the evidence.").

a. Extreme emotional disturbance under New York law

Under New York law, acting with extreme emotional disturbance at the time of a homicide is a partial affirmative defense to murder in the second degree; it reduces the criminal conduct to first degree manslaughter. N.Y. Penal Law §§ 125.20(2), 125.25(1)(a); Vargas-Sarmiento v. U.S. Dep't of Justice, 448 F.3d 159, 166 (2d Cir. 2006). The State Legislature created the extreme emotional disturbance affirmative defense out of recognition "that some intentional homicides may result from an understandable human response deserving of mercy." People v. Harris, 95 N.Y.2d 316, 318 (2000) (internal quotation marks and citations omitted).

"The determination whether a defendant is entitled to a charge on extreme emotional disturbance requires the trial court to assess whether sufficient evidence was present 'for the jury to find by a preponderance of the evidence that the elements of the affirmative defense are satisfied.'" Id. at 319 (quoting People v. Moye, 66 N.Y.2d 887, 889 (1985)). The court "is bound to view the evidence in the light most favorable to the defendant" in making such a determination. People v. McKenzie, 19 N.Y.3d 463, 466 (2012). "The charge must be given if there is evidence reasonably supportive of the defense, even if there is other evidence which, if credited, would negate it." Id.

The Court of Appeals has recently made clear that a trial court must avoid fact-finding – the court's function is limited to that of a gate-keeper, "excluding

claims that are patently insufficient, either by reason of the absence of evidence from which the claimed disturbance might be reasonably inferred or for lack of proof of any but a speculative relation between the alleged disturbance and a plausible triggering circumstance or between the disturbance and the defendant's homicidal acts." Id. at 468 (citations omitted). "In the absence of the requisite proof, an extreme emotional disturbance charge should not be given because it would invite the jury to engage in impermissible speculation concerning [the] defendant's state of mind at the time of the homicide." People v. Roche, 98 N.Y.2d 70, 76 (2002); see also People v. Wells, 955 N.Y.S.2d 684, 689 (3d Dep't 2012) (citations omitted).

"A defendant cannot establish an extreme emotional disturbance without evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control." Roche, 98 N.Y.2d at 75; see, e.g., Moye, 66 N.Y.2d at 890 (finding that "there was sufficient evidence for submission to the jury – which a rational jury might have accepted or rejected – of an explanation or excuse for defendant's emotional state, in his recounting of the victim's continued ridicule and taunting about his impotence"); People v. Martinez, 587 N.Y.S.2d 715, 715 (1992). Unlike the "heat of passion" doctrine, extreme emotional disturbance does not require a spontaneous triggering event; rather, "it may be that a significant mental trauma has affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore." People v. Casassa, 49 N.Y.2d 668, 676 (1980) (internal quotation marks and citation omitted).

In order to be entitled to an extreme emotional disturbance instruction under New York state law, a defendant must demonstrate: (1) "that he or she acted under the influence of an extreme emotional disturbance;" and (2) "that there was a reasonable explanation or excuse for that disturbance." Roche, 98 N.Y.2d at 75.

"The first, subjective element is met if there is evidence that defendant's conduct at the time of the incident was actually influenced by an extreme emotional disturbance." Id. at 76; see also McKenzie, 19 N.Y.3d at 467 ("[T]he subjective element of the extreme emotional disturbance defense may be inferred simply from circumstances indicative of a loss of control and, concomitantly, it may be established without psychiatric evidence.").

"The second is an objective element and requires proof that defendant's emotional disturbance was supported by a reasonable explanation or excuse." Roche, 98 N.Y.2d at 76 (explaining that "[t]his is determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for the emotional disturbance was reasonable") (internal quotation marks and citation omitted).

The Court of Appeals recently held in People v. McKenzie that the jury should have been charged on extreme emotional disturbance. 19 N.Y.3d at 465. In McKenzie, defendant was convicted of second degree murder based on evidence that he killed his fiancé – she was stabbed with a knife 47 times following a heated

argument between defendant and the victim based on her refusal to engage in sexual relations with him and her disclosure that she had been unfaithful to him with his friend. 19 N.Y.3d at 465-66.

The court found the subjective element of extreme emotional disturbance had been met because of the brutal nature of the crime and the following evidence: defendant admitted to a friend following the crime that he "just snapped;" the friend testified that defendant appeared "spaced out" and "out of it" at that time; and when the defendant called 911 to confess soon after the incident, he stated to the dispatcher that he "just lost it" and that he had "blacked out." Id. at 465-66.

The court similarly found the objective element to have been met because, viewing the evidence in the light most favorable to defendant, the reasonableness of defendant's explanation for the crime was for the jury to decide. The court explained: "Although it did not require it, the evidence plausibly allowed the conclusion that [the victim's] sexual rejection of defendant, together with her closely following abrupt and apparently vengeful disclosure of her infidelity with his friend, precipitated not just ordinary anger or even rage, but an onrush of emotion leaving defendant bereft of self-control." Id. at 468; see also Harris, 95 N.Y.2d at 320-21 (where the subjective and objective elements of extreme emotional disturbance were satisfied because "defendant's confessions explained that he had completely lost control over his actions in response to [the victim's] taunts" and a rational jury "could reasonably infer that [defendant] was provoked to rage over the emotionally charged subject of his lover's past and potentially future infidelity with [the

victim]");[13] Moye, 66 N.Y.2d at 890 ("[E]xtreme emotional disturbance was deemed inferable simply from evidence of an uncommonly savage assault together with the victim's initial sexual taunting and the assailant's closely following admissions, in the course of which he stated that he 'snapped' and 'went bananas.'")

In contrast, in People v. Roche, the New York Court of Appeals determined that the evidence at trial was insufficient to support an extreme emotional disturbance charge. 98 N.Y.2d at 71. In Roche, evidence was presented at trial that the defendant's common-law wife had been stabbed 12 to 14 times in the face, back, and chest. Id. at 72. Defendant and the victim had been arguing earlier in the day and an acquaintance of defendant testified that defendant had expressed both a desire and an inability to leave her in the weeks prior. Id. at 72-73. Following the stabbing, the defendant walked out of the building with a duffle bag and allegedly stated: "'I have to take everything out of here because the police is going to check it out.'" Id. at 73. He visited an acquaintance at a nearby building, where he took off two sweaters he was wearing and "carefully inspected them;" over the course of the

[13] In People v. Harris, the court explained the circumstances as follows:

> [D]efendant's confessions explained that he completely lost control over his actions in response to [the victim's] taunts. Defendant related that he started hitting [the victim] and that 'it was like [he] was looking at a movie [and] didn't have any control' at the time. He admitted that he just 'couldn't stop' his attack on [the victim]. He stated that he started crying and vomiting after he killed [the victim] with a machete. He then related how he cut his victim to pieces.

95 N.Y. at 320.

next few hours, the defendant proceeded to tell a number of people that the victim had killed herself. Id. at 73-74.

The defendant eventually went to the police station and announced: "'My wife killed herself. I want to find out who did this. That's why I'm here.'" Id. The Court of Appeals found that based on defendant's controlled behavior directly following the attack, and the lack of evidence that defendant "actually suffered from a mental infirmity at the time of the stabbing," an extreme emotional disturbance charge was unwarranted. Id. at 76-77.

In the matter currently before this Court, petitioner stated in his confession on the night of the crime that he "got pissed off" after Eustate called him a "big stupid fag." (Ex. 27.)[14] Although at trial petitioner testified that he was "crazy" over his belief that Eustate and the person he believed to be her new boyfriend were keeping his daughter from contacting him (tr. 455), and that he "lost [his] mind" and "kind of lost [his] head out of jealousy and things" (tr. 456), the trial court deemed the evidence insufficient to support the requested charge.

While this Court may not have arrived at the same conclusion had it decided the issue on the first instance, AEDPA requires that this Court defer to findings made by the state court. 28 U.S.C. § 2254(e)(1); Lopez v. Ercole, No. 09 Civ. 1398,

---

[14] According to the detective who took plaintiff's statement, plaintiff explained the incident as follows: "My ex-girlfriend was there. She began to tell me that I was a bad guy, I was a bad husband. I got mad. I felt tormented. I took out a knife that I always carry in my front left waistband area and began to plunge the knife in the direction of Eduvigis Eustate. I think I struck her in the stomach." (Ex. 29; tr. 526-27.)

2010 WL 1628994, at *17 (S.D.N.Y. Apr. 21, 2010), report & recommendation adopted by 2014 WL 285079 (S.D.N.Y. Jan. 27, 2014). Here, the trial court applied the correct two-prong test in deciding whether to give the charge. It made a reasonable determination that while there was sufficient credible evidence for the jury to determine that petitioner was acting out of anger or intoxication (or both), there was insufficient evidence for the jury to find petitioner was acting under an extreme emotional disturbance. The court does not appear to have engaged in fact-finding or a weighing of the evidence; it made a difficult determination regarding whether the evidence presented at trial justified the charge. Since New York law instructs trial courts to avoid unwarranted charges because "it would invite the jury to engage in impermissible speculation concerning defendant's state of mind at the time of the homicide," Roche, 98 N.Y.2d at 76, and because the trial court was in the best position to assess the evidence presented at trial, the Court finds that the trial court did not violate New York law in declining to charge the jury on extreme emotional disturbance.

Having decided that the trial court did not violate state law, the Court need not address the issues of whether petitioner's due process rights have been violated and if so, whether such occurrence was the result of a decision contrary to or an unreasonable application of clearly established Supreme Court law. Rather, petitioner's constitutional rights were not infringed, and thus that is the end of the inquiry. See Blazic, 900 F.2d 534, 541 (2d Cir. 1990) ("[D]ue process does not

require the giving of a jury instruction when such charge is not supported by the evidence.") (citations omitted).

Accordingly, petitioner's claim for habeas based on the trial court's failure to instruct the jury on extreme emotional disturbance is without merit.

V. EXCESSIVE SENTENCE

As a separate claim, Moranto claims that the trial court's imposition of the maximum sentence "was excessive and should be reduced in the interest of justice." (Pet. at 7.) Moranto alleges that his sentence should be reduced because his "mental illness reduced his capacity for self-control, he committed the crime while under an extreme emotional disturbance, and he expressed contrition for his crime." (Id.)

Petitioner's claims must fail because they do not raise a federal constitutional issue: "No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curium) (citations omitted); see also Parson v. Superintendent of Fishkill Corr. Facility, No. 12 Civ. 2358, 2013 WL 1953181, at *2 (S.D.N.Y. May 13, 2013). Accordingly, petitioner's claim for relief based on an excessive sentence is summarily denied.

C. CONCLUSION

For all of the reasons set forth above, the petition for habeas corpus is DENIED.

The Court sua sponte certifies pursuant to 28 U.S.C. § 2253, however, that petitioner has made a substantial showing of the denial of a constitutional right with respect to the issue of whether the evidence presented to the trial court was sufficient so as to necessitate an extreme emotional disturbance charge at his trial. As to all other issues, a certificate of appealability is denied because petitioner has not made a substantial showing of the denial of a constitutional right as to those issues.

Pursuant to 28 U.S.C. § 1915(a), the Court grants petitioner permission to proceed in forma pauperis if petitioner decides to file an appeal because the Court finds that such appeal would be taken in good faith.

The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated: New York, New York
March 10, 2014

K. B. Forrest

KATHERINE B. FORREST
United States District Judge

CC:
Julio Moronta
DIN# 10-A-1697
Sullivan Correctional Facility
P.O. Box 116
Fallsburg, NY 12733